UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JACOB B.[1],                                    Case No. 1:20-cv-617
     Plaintiff,

                                                  Litkovitz, M.J.

  vs.

COMMISSIONER OF                           **ORDER**
SOCIAL SECURITY,
     Defendant.

      Plaintiff Jacob B. brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for supplemental security income ("SSI"). This matter is before the Court on plaintiff's statement of errors (Doc. 12) and the Commissioner's response in opposition (Doc. 16).

**I. Procedural Background**

      Plaintiff protectively filed his application for SSI in June 2017, alleging disability since March 11, 2010, due to paranoid schizophrenia, social anxiety, irregular heartbeat, depression, inability to interact with others, and uncontrollable muscle movement. The application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ") Thuy-Anh T. Nguyen. Plaintiff, his father, and a vocational expert ("VE") appeared and testified at the ALJ hearing on April 30, 2019. On July 3, 2019, the ALJ issued a decision denying plaintiff's SSI application. This

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

decision became the final decision of the Commissioner when the Appeals Council denied review on June 11, 2020.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for SSI, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920 (b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

### B.  The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] has not engaged in substantial gainful activity since June 12, 2017, the application date (20 CFR 416.971 *et seq.*).
>
> 2. The [plaintiff] has the following severe impairments: schizophrenia, mood disorder, and panic disorder (20 CFR 416.920(c)).
>
> 3. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except that he is further limited to performing simple, routine tasks that are not fast-paced and that do not have high production quotas; interacting in situations that do not require tandem work, resolving conflicts, or working directly with the general public; occasionally interacting with coworkers and supervisors; and working in a low stress environment defined as one with occasional changes in the work setting where changes can be explained in advance.

5. The [plaintiff] has no past relevant work (20 CFR 416.965).

6. The [plaintiff] was born [in] . . . 1996 and was 20 years old, which is defined as a younger individual age 18-49, on the date the application was filed. (20 CFR 416.963).

7. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 416.969 and 416.969a).[2]

10. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since June 12, 2017, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-25).

**C. Judicial Standard of Review**

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

---

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative medium, unskilled occupations such as a dishwasher/kitchen helper (278,000 jobs in the national economy), a sweeper (25,000 jobs in the national economy), and a hand packager (43,000 jobs in the national economy). (Tr. 24, 49).

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

**D. Specific Errors**

On appeal, plaintiff contends that the ALJ erred in finding the opinions from treating psychiatrist, Stephen Rush, M.D., only minimally persuasive. Plaintiff further contends that he cannot work on a sustained basis. (Doc. 12). The Commissioner counters that substantial evidence supports the ALJ's finding that the opinion of Stephen Rush, M.D., is only minimally persuasive and that plaintiff's overall treatment records,[3] noted improvement, and daily activities all support the RFC for a reduced range of medium work. (Doc. 16).

---

[3] In the introduction section of the instanter memorandum in opposition, the Commissioner reports, as though it were fact, that plaintiff is "famous on YouTube" and that "60 Minutes reached out to him to do an interview for a special on schizophrenia." (Doc. 16 at PAGEID 849 (citing Tr. 378)). That quotation is taken from a Cincinnati Children's Hospital Psychiatric Outpatient Clinic Note made when plaintiff was seventeen years old. The same treatment note paragraph begins, "Pt today is presenting with psychotic features and homicidal and suicidal ideations . . . also having extreme paranoid delusions . . . [and] hearing command voices to harm others and self." (Tr. 378). The treatment note concludes, "Pt. [patient] to be hospitalized immediately for homicidal and suicidal ideation for safety and stabilization." (Tr. 380). The Commissioner's out-of-context quotation is intentionally misleading and inappropriate.

**E. Pertinent Evidence**

*1. Relevant History*

Plaintiff, age twenty on the date he filed his application, has been hospitalized for inpatient psychiatric treatment five times: three times at Children's Hospital Medical Center in 2012 and 2013 and twice at Lindner Center of Hope since turning eighteen years old. (Tr. 259). He has undergone outpatient treatment with at least seven mental health providers. (Tr. 269). He has been prescribed at least six medications, including an anti-psychotic. (Tr. 39).

Plaintiff lives with his parents. (Tr. 19). Other than for appointments with his doctor, he seldom leaves the home. (Tr. 37). He showers once every week or two. (Tr. 38). His medications sometimes cause him to sleep 20 hours per day. (Tr. 39). He does not drive or engage in social activities, and his only non-parental relationship is with an online girlfriend whom he has never met in person. (Tr. 40). He sometimes believes his parents are among those trying to kill him, and he often barricades himself in his room for protection. (Tr. 40-41, Tr. 280). He engages in self-injury. (Tr. 41, 270).

According to his parents, plaintiff was a vibrant, athletic child. (Tr. 43, 46). However, in early adolescence, "he just got worse and worse." (Tr. 46). When his symptoms first presented, plaintiff became unable to complete tasks or follow processes even though "he had done it 100 times before." (Tr. 46). He was a talented athlete, and his father encouraged him to continue participating in youth sports because his parents thought it would be good for him, but "[h]is abilities got worse and worse and worse" until his father "couldn't watch him feel that way

anymore." (Tr. 46-47). His parents first sought psychological/psychiatric services for plaintiff in November 2010. (Tr. 268).

Plaintiff was hospitalized for in-patient psychiatric treatment for the first time in 2012 at age 16. (Tr. 657). At that time, he had already been diagnosed with schizophrenia, and he was "admitted for panic symptoms, severe persistent delusions, hallucinations, and negative symptoms of flattened affect." (Tr. 657). Although plaintiff was "cooperative," and had "clear and coherent" thought process, he also suffered "delusions, paranoid ideation, phobias" and "visual, tactile and auditory hallucinations." (Tr. 660).

He left school permanently in the tenth grade after failing to complete the ninth grade. (Tr. 37-38). Plaintiff testified that he left school because he feared hurting himself or others, and he had "no idea what was going on." (Tr. 39). According to his father, he left school because teachers were afraid to have him in their classrooms. (Tr. 44). At parent teacher conferences, teachers reported that plaintiff would put a hoodie over his head and not respond or even acknowledge that someone had spoken to him. (Tr. 44).

Throughout his adolescence, he suffered auditory and visual hallucinations. (Tr. 660, 269). Plaintiff continues to experience hallucinations a few times every day. (Tr. 37-38).

    2.    *Dr. Stephen Rush, M.D.*

Plaintiff began treatment with Dr. Rush, a psychiatrist, in November 2018. (Tr. 268). Dr. Rush specializes in treatment resistant schizophrenia spectrum and mood disorders. (Tr. 281).

On November 1, 2018, Dr. Rush reported that plaintiff, a twenty-two year old male with a history of schizophrenia, began experiencing auditory hallucinations at age 11 and had been hospitalized for in-patient psychiatric treatment five times between 2012 and 2018. (Tr. 268-69). He consistently hears the same three voices, one male and two female, that "tell him that people are trying to kill him via a variety of methods, from poisoning to throwing a grenade into his bedroom window." (Tr. 268). Plaintiff engages in self-injury, including punching himself in the chest and torso, to combat particularly severe delusions. (Tr. 270). Plaintiff "spends 23+ hours of each day in his room as a method of keeping himself safe from being killed by others, which at times includes his parents," but later states "that he is currently happy with the course of his life, such as it is." (Tr. 268). Dr. Rush concluded that plaintiff was "under-treated as he is not on a sufficient dose of quetiapine to have an antipsychotic effect" so he increased plaintiff's quetiapine dose to 400 milligrams. (Tr. 272).

On November 15, 2018, plaintiff appeared wearing pajamas and "mildly malodorous though appears groomed." (Tr. 265). Plaintiff's thought processes were well organized and goal directed, but he continued to experience auditory and visual hallucinations and paranoid delusions about people wanting to kill him. (Tr. 266). Dr. Rush continued to prescribe a 400 milligram dose of quetiapine to allow plaintiff time to adjust to the increased dose. (*Id.*).

On January 8, 2019, plaintiff reported to Dr. Rush that he had been taking quetiapine consistently and "that he feels 'a lot better' and cites feeling 'more social and more confident'" and "has begun dating a girl online." (Tr. 267). However, according to that same treatment note, he "continues to have delusions that people are trying to kill him, which includes his parents and

strangers," "continue[s] to barricade himself in his room," and "continues to hear, without change, the three voices he has always heard." (Tr. 267). Indeed, earlier that week he became "convinced there were microphones and cameras planted in his room and he spent those two days 'tearing up' his room looking for them." (Tr. 267). Dr. Rush increased his quetiapine dose to 600 milligrams with the continued goals of "decreasing positive symptoms and hopefully then getting him out of his room." (Tr. 262).

On March 20, 2019, Dr. Rush completed a mental impairment questionnaire in which he opined that plaintiff was mildly limited in understanding, remembering, and carrying out very short, simple instructions, and understanding workplace hazards. (Tr. 275-76). He found plaintiff severely limited in his abilities to remember locations and work procedures; understand and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain attendance, or to be punctual; and in all other aspects of adaptation. (Tr. 276). Clinical findings included auditory and visual hallucinations that people will attack and kill him which restrict him from leaving his room freely. (Tr. 275). Dr. Rush found plaintiff severely limited in all aspects of social interaction, including the ability to interact appropriately with the general public; ask simple questions; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without exhibiting behavioral extremes; and maintain socially appropriate behavior. (Tr. 277). According to Dr. Rush, plaintiff would experience four or more episodes of decompensation within a 12-month period and would miss four or more days of work per month due to his impairments or treatment. (Tr. 277-78).

Dr. Rush attached to this questionnaire a narrative in which he reported that plaintiff suffers from severe, continuous schizophrenia which has never been in remission. (Tr. 280). His symptoms include delusions that people, including his parents, are trying to kill him, auditory hallucinations with voices that confirm his delusions and visual hallucinations which he believes to be alien lifeforms. (*Id.*). Dr. Rush opined that plaintiff's severe paranoid delusions prevent him from performing activities of daily living as he cannot leave the house without severe anxiety that he is going to die. Dr. Rush further reported that even when plaintiff is at home, he barricades himself in his room to ensure that no one can enter. (*Id.*). Dr. Rush stated that plaintiff's ability to adapt to any changes in his environment, or potential workplace, would be severely impaired by his paranoid delusions because he is continuously decompensated and they have yet to find treatment that adequately addresses his symptoms. (Tr. 280). Dr. Rush further opined that "the negative symptom avolition[4] . . . prevents him from setting goals and making plans independently of others." (*Id.* (footnote added)).

       3.     *Dr. Norman Berg, M.D.*

Norman Berg, M.D., the consultative examiner, examined plaintiff for disability purposes in August 2017. (Tr. 241-49). On mental status examination, Dr. Berg found plaintiff exhibited

---

[4] As explained in a recent peer-reviewed psychiatric journal, avolition is a common negative symptom of schizophrenia, specifically:
> Avolition reflects the decrease in the motivation to initiate and perform purposeful activities. In the larger picture, the individual seems to experience a lack of interest in improving themselves intellectually, physically, socially, and financially. The activities that are not performed range from elementary ones, such as grooming, personal hygiene, or preparing food, and extending to more complex acts, such as going to work and/or school and engaging in social activities. A person experiencing avolition may stay at home, staring at the TV for hours and days, hardly following the content, rather than seek work or peer interaction.

Gregory Strauss, *et al.*, *Avolition as the Core Negative Symptom in Schizophrenia: Relevance to Pharmacological Treatment Development,* 7 Schizophrenia 16, at 2 (2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7910596/ (last visited 1/7/2022).

normal speech, goal-directed thought process, and no flight of ideas. (Tr. 244). He was moderately depressed with anxiety and exhibited slightly blunted affect, no indication of psychomotor retardation, fair orientation, and satisfactory eye contact. (Tr. 244-45). There was no indication of agoraphobia (though plaintiff stated that he prefers not to be around other people), and he appeared to function in the low-average range of intelligence with memory generally commensurate with estimated level of intelligence. (Tr. 245). Plaintiff was not suicidal or homicidal, but he indicated that he may hit himself when he has psychotic episodes. (Tr. 244-45). Plaintiff reported that he experienced daily auditory and visual hallucinations, but he did not present as overtly psychotic or appear to be experiencing hallucinations or paranoid ideation during the examination. (Tr. 245). Plaintiff admitted that he believes that people want to kill him and that he had felt that way for years. (*Id.*). Plaintiff incorrectly identified the day and the date of the interview and was unable to correctly make change for $20, but he knew the month, year, president and the purpose of the evaluation. (Tr. 244-46). Plaintiff indicated that his medications seem to reduce and help him cope with the visual and auditory hallucinations, but he still experiences them almost daily. (Tr. 245). He planned to continue taking his psychiatric medications, but he had never been employed and was not interested in vocational training, seeking employment, or attending a day activity program because of his emotional problems. (Tr. 246-47).

     Dr. Berg diagnosed schizoaffective disorder, depressed type and social anxiety disorder. (Tr. 246). Dr. Berg opined that plaintiff did not appear to be exaggerating or minimizing his conditions, and he appeared consistent with the referral data. (Tr. 246). Dr. Berg concluded that

plaintiff's depression and anxiety would interfere to at least some extent with his being persistent in his attention and concentration. (Tr. 248). Dr. Berg opined that, since plaintiff has never held employment, it is difficult to predict his ability to function in a workplace, but he noted that plaintiff has no interpersonal relationships other than online contact and it appears that he would have difficulty coping with routine work pressure. (Tr. 249).

### F. Whether the ALJ Erred in Finding Dr. Rush's Opinion Minimally Persuasive

For claims filed on or after March 27, 2017, new regulations apply for evaluating medical opinions. *See* 20 C.F.R. § 1520c (2017); *see also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). These new regulations eliminate the "treating physician rule" and deference to treating source opinions, including the "good reasons" requirement for the weight afforded to such opinions.[5] *Id*. The Commissioner will "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)[6], including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner will consider "how persuasive" the medical opinion is. 20 C.F.R. § 416.920c(b).

---

[5] For claims filed prior to March 27, 2017, a treating source's medical opinion on the issue of the nature and severity of an impairment is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "The Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)).

[6] A "prior administrative medical finding" is defined as "[a] finding, other than the ultimate determination about whether the individual is disabled, about a medical issue made by an MC [medical consultant] or PC [psychological consultant] at a prior administrative level in the current claim." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850. For clarity, the Court will refer to the limitations opined by the state agency reviewing physicians and psychologists as "assessments" or "opinions."

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 416.920c(c)(1)-(5). The most important factors the ALJ must consider are supportability and consistency. 20 C.F.R. § 416.920c(b)(2). With respect to the supportability factor, "[t]he more relevant the objective medical evidence[7] and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . ." 20 C.F.R. § 416.920c(c)(2). The ALJ is required to "*explain* how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 416.920c(b)(2) (emphasis added). Conversely, the ALJ "may, but [is] not required to, explain" how he/she considered the relationship, specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. *Id.* However, where two or more medical opinions or prior administrative findings about the same issue are equally persuasive, the ALJ must articulate how he or she "considered the other most persuasive factors in paragraphs (c)(3) through (c)(5). . . ." 20 C.F.R. § 404.1520c(b)(3). Finally, the ALJ is not required to articulate how he or she considered evidence from nonmedical sources. 20 C.F.R. § 404.1520c(d).

---

[7] Objective medical evidence is defined as "signs, laboratory findings, or both." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850.

In evaluating Dr. Rush's medical opinion, the ALJ stated:

This opinion is only minimally persuasive, as his conclusions are disproportionate to his own prior clinical findings. Specifically, the record shows that he saw the claimant on only three prior occasions, and in each note he found intact memory, mildly impaired attention and concentration, organized and goal-directed thoughts (Exhibit 4F). Also, despite his finding of little to no response to psychotropic therapy, the claimant reported in their second session that he felt "a lot better" and was "more social and more confident." In fact, he had started a relationship with a girl online. Thus, the actual treatment record is not consistent with Dr. Rush's opinion.

(Tr. 23).

The ALJ's conclusion that Dr. Rush's opinion is not consistent with the treatment record and his own clinical findings is not supported by substantial evidence. The ALJ selectively cited to portions of the treatment record to the exclusion of others that support Dr. Rush's opinion. Although Dr. Rush noted plaintiff's well-organized and goal directed thought processes, he also discussed at length plaintiff's consistent and continuing auditory and visual hallucinations and paranoid delusions that others, including his parents, were trying to kill him. (Tr 261, 266, 272). Indeed, plaintiff's treatment goal is to decrease plaintiff's hallucinations and delusions significantly "and hopefully then getting him out of his room." (Tr. 262). Dr. Rush's findings that plaintiff was "well-groomed" and had "goal directed thought processes" do not detract from the persuasiveness of Dr. Rush's opinion when viewed in the context of the entire treatment note.

In addition, the ALJ relied on plaintiff's self-report of feeling "a lot better" and "more social and confident" (Tr. 23, 267), but she failed to mention that the same January

1, 2019 treatment note also stated that plaintiff "continue[s] to barricade himself in his room to protect himself from any dangers, which continues to include the possibility that anyone passing by his home on the street could harm him by launching a rocket into his room or, again, throwing a grenade." (Tr. 267). Furthermore, he "continues to hear, without change, the three voices he has always heard." (*Id.*). Indeed, the week before this appointment with Dr. Rush, plaintiff remained convinced that someone planted microphones and cameras in his bedroom, and he spent two full days dismantling his room in an effort to find them. (*Id.*). At the conclusion of the January 8, 2019 appointment where plaintiff reported feeling "better" and "more confident," Dr. Rush actually increased plaintiff's antipsychotic medication, quetiapine, from 400 milligrams to 600 milligrams in a continued effort toward "getting him out of his room." (Tr. 262). The ALJ's selective citations do not reasonably support her conclusions.

Even the consultative examiner, Dr. Berg, indicated that plaintiff "may have some difficulty with attention and concentration if he is being distracted by auditory and visual hallucinations" and that his mental illness would interfere with "his being persistent in his attention and concentration and in his performing simple tasks and 2-3 step tasks." (Tr. 248). Notably, Dr. Berg stressed that plaintiff "has no face-to-face interpersonal relationships" and "would have difficulty coping with routine work pressure." (Tr. 249).

In addition, the ALJ found Dr. Rush's opinion only "minimally persuasive" as disproportionate to his own clinical findings but did not adequately explain why. Specifically, the ALJ relied primarily on one cherry-picked sentence from a much larger treatment note to

15

imply that Dr. Rush exaggerated plaintiff's mental illness. In doing so, the ALJ ignored the fact that plaintiff's treating psychiatric specialist and the consultative examiner both found greater limitation in plaintiff's ability to interact with others than the ALJ did. "This is especially concerning considering the revised regulations applicable to claims filed on or after March 27, 2017, governing the consideration of opinion evidence, which stress the importance of consideration of supportability and consistency with the record as a whole." *Robinson v. Kijakazi*, No. CV 20-5032, 2021 WL 3088066, at *2 (E.D. Pa. July 22, 2021) (citing 20 C.F.R. §§ 404.1520c(2), 416.920c(2) ("The factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how persuasive we find a medical source's medical opinion . . . to be.")).

In the absence of a sufficient explanation of supportability and consistency with the record as a whole, the Court cannot conclude that the ALJ's consideration of Dr. Rush's opinion is supported by substantial evidence. "[A] district court cannot uphold an ALJ's decision, even if there 'is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" *Ephraim v. Saul*, No. 1:20CV00633, 2021 WL 327755, at *7 (N.D. Ohio Jan. 8, 2021), *report and recommendation adopted sub nom. Ephraim v. Comm'r of Soc. Sec.*, No. 1:20CV633, 2021 WL 325721 (N.D. Ohio Feb. 1, 2021) (quoting *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011)); *White v. Comm'r of Soc. Sec.*, No. 1:20-cv-588, 2021 WL 858662, at *21 (N.D. Ohio Mar. 8, 2021) ("Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent

explanation of his reasoning. Here, the ALJ failed to build an accurate and logical bridge from the evidence to his conclusions in his RFC analysis and in his evaluation of the opinions of" the treating physicians.). Accordingly, the ALJ's decision must be reversed and remanded for further proceedings to properly analyze Dr. Rush's medical opinions pursuant to 20 C.F.R. § 404.1520c.

### G. Whether the ALJ Erred in Finding Plaintiff Could Work on a Sustained Basis

In his second assignment of error, plaintiff contends that the ALJ erred in determining that plaintiff could realistically work on a sustained basis. (Doc. 12 at PAGEID 832-34). As stated above, the undersigned orders that this matter be remanded because the ALJ failed to properly analyze Dr. Rush's medical opinion according to 20 C.F.R. § 404.1520c. As resolution of this issue on remand may impact the remainder of the sequential evaluation process, it is not necessary to address plaintiff's second assignment of error. *See Trent v. Astrue*, No. 1:09-cv-2680, 2011 WL 841538, at *7 (N.D. Ohio Mar. 8, 2011).

## II. Reversed and Remanded for Further Proceedings

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). This matter is reversed and remanded for further proceedings with instructions to the ALJ to reconsider the opinion evidence from Dr. Rush in accordance with 20 C.F.R. § 404.1520c; to reassess the testimony and evidence from plaintiff and his parents; and for further medical and vocational evidence as warranted.

**IT IS THEREFORE ORDERED THAT:**

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date:  1/14/2022

Karen L. Litkovitz
United States Magistrate Judge